# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-665V**
**Filed: August 10, 2026**

| | |
|---|---|
| DWAYNE LEE,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Special Master Horner |

*Ronald Craig Homer, Conway, Homer, P.C., Boston, MA, for petitioner.*
*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for respondent.*

**DECISION**[1]

On June 1, 2020, petitioner, Dwayne Lee, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he suffered Guillan-Barré Syndrome ("GBS") caused by the hepatitis A vaccination that he received on June 24, 2017. (ECF No. 1.) For the reasons set forth below, I conclude that petitioner is *not* entitled to an award of compensation.

## I. Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a *causal link* between the vaccination and the injury. In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

In many cases, however, the vaccine recipient may have suffered an injury *not* of the type covered in the Vaccine Injury Table. In such instances, an alternative means exists to demonstrate entitlement to a Program award. That is, the petitioner may gain an award by showing that the recipient's injury was "caused-in-fact" by the vaccination in question. § 300aa-13(a)(1)(B); § 300aa-11(c)(1)(C)(ii). In such a situation, of course, the presumptions available under the Vaccine Injury Table are inoperative. The burden is on the petitioner to introduce evidence demonstrating that the vaccination actually caused the injury in question. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991). In this case, petitioner has not alleged an injury that appears on the Vaccine Injury Table relative to the specific vaccination at issue in this case. 42 C.F.R. § 100.3(a). Therefore, petitioner must demonstrate causation-in-fact.

The showing of causation-in-fact must satisfy the "preponderance of the evidence" standard, the same standard ordinarily used in tort litigation. § 300aa-13(a)(1)(A); *see also Althen*, 418 F.3d at 1278-79; *Hines*, 940 F.2d at 1525. Under that standard, petitioner must show that it is "more probable than not" that the vaccination was the cause of the injury. *Althen*, 418 F.3d at 1279. He need not show that the vaccination was the sole cause but must demonstrate that the vaccination was at least a "substantial factor" in causing the condition at issue and was a "but for" cause. *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, petitioner must supply "proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury." *Althen*, 418 F.3d at 1278 (quoting *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992)). Ultimately, petitioner must satisfy what has come to be known as the *Althen* test, which requires: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Id*.

A petitioner may not receive a Vaccine Program award based solely on his or her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1). Medical records are generally

viewed as particularly trustworthy evidence because they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. § 300aa-13(b)(1). A petitioner may rely upon circumstantial evidence. *See Althen*, 418 F.3d at 1280. Moreover, the *Althen* court noted that a petitioner need not necessarily supply evidence from medical literature supporting petitioner's causation contention, so long as the petitioner supplies the medical opinion of an expert. *Id*. at 1279-80. While scientific certainty is not required, that expert's opinion must be based on "sound and reliable" medical or scientific explanation. *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record but are empowered to determine the format for taking evidence based on the circumstances of each case, including having the discretion to decide cases without an evidentiary hearing. Vaccine Rule 3(b)(2); Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1).

## II. Procedural History

Between June of 2020 and August of 2021, petitioner filed medical records and an affidavit marked as Exhibits 1-12. Thereafter, the case was assigned to the undersigned's docket. Respondent then filed his Rule 4 Report in November of 2021. (ECF No. 37.) Respondent contested that the hepatitis A vaccine can cause GBS as a matter of general causation (*Id*. at 13) and also contended that the medical records lacked any medical opinion to support specific causation (*Id*. at 14).

Thereafter, petitioner filed additional medical records (Exs. 14-20) over the course of a year and then filed an expert report by neurologist Kazim Sheikh, M.D., in July of 2023 (Exs. 21-64). Respondent responded in February of 2024 by filing reports by neurologist Brian Callaghan, M.D. (Exs. A-B) and immunologist You-Wen He, M.D., Ph.D. (Exs. C-D). I issued a Rule 5 order reviewing the parties' expert reports (ECF No. 71) and the parties then filed supplemental reports (Exs. 65, E-F). In a joint status report filed January 15, 2025, the parties agreed that the case was ripe for briefing pursuant to Vaccine Rule 8(d). (ECF No. 83.)

Petitioner filed a motion for a ruling on the written record on June 9, 2025.[3] (ECF No. 89.) Respondent filed his response on August 13, 2025. (ECF No. 91.) Petitioner

[3] Petitioner also filed additional medical literature on June 9, 2025. (Exs. 66-71.)

opted not to file any reply. I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record"). Accordingly, petitioner's motion is now ripe for resolution.

## III. Factual History

Petitioner received the hepatitis A vaccination at issue on June 24, 2017. (Ex. 1, p. 1.) He was 44 years old and had a prior medical history that included hypertension and type II diabetes. (Ex. 3, pp. 4, 44.)

On July 27, 2017, 33 days post-vaccination, petitioner presented to the emergency department for chest pain and hypertension. (Ex. 2, p. 90.) He reported a three-day history of elevated blood pressure and a one-day history of chest pain accompanied by headache, slurred speech, left sided weakness, and decreased sensation with tingling in the lower extremities. (*Id*. at 75-78, 90.) The initial concern was for a hypertensive emergency with neurological manifestations. (*Id*. at 77.) However, by the time he was transferred to the ICU for closer observation, GBS was also beginning to be suspected. (*Id*. at 153-58.) When petitioner was transferred to the ICU on July 29, 2017, neurology felt there was a "high possibility" of GBS, and during examination in the ICU, petitioner "recalled [a] couple episode[s] of bloody diarrhea 7-10 days prior [to] the weakness," though he denied any cough or sick contacts. (*Id*. at 165.) A lumbar puncture taken July 30, 2017, showed elevated protein and he was started on IVIg. (*Id*. at 70, 177, 181-86.) Testing for *Campylobacter jejuni* ("*C. jejuni*") antibodies showed an equivocal result of 0.95 (0.90-1.10 = antibody detected). (*Id.* at 477.) A test for ganglioside antibodies was negative for Asialo GM1, GD1b, and GQ1b antibodies, and equivocal for GM1 and GD1a antibodies. (*Id*. at 475.) He was discharged to inpatient rehabilitation on August 3, 2017, with possible GBS. (*Id*. at 70.)

Petitioner's GBS diagnosis is not disputed. Therefore, it is not necessary to discuss petitioner's subsequent course of care in full. However, I do note that petitioner has cited a number of notations in subsequent records wherein petitioner raised his GBS as having followed or having been secondary to his hepatitis A vaccine. Those notations are discussed under *Althen* prong two.

## IV. Summary of Expert Opinions

### a. Petitioner's Neurologist Kazim Sheikh, M.D.[4]

Dr. Sheikh explains that GBS refers to a group of clinically and pathophysiologically heterogeneous peripheral nerve disorders with an acute, monophasic course, generally believed to be autoimmune. (Ex. 21, p. 9.) It is the most common cause of acute flaccid paralysis, with an overall incidence of 1 to 2 cases per 100,000 per year. (*Id.*) Case control and observational studies have shown that it is frequently preceded by either upper respiratory or gastrointestinal infections, including cytomegalovirus, Epstein Barr, *Mycoplasma pneumoniae*, *Haemophilus influenzae*, *C. jejuni*, and hepatitis E. (*Id*. at 9-10 (citing Kazim A. Sheikh et al., *Guillain-Barré Syndrome*, 26 CONTINUUM 1184 (2020) (Ex. 24)).)

These infections are common while GBS is rare, suggesting that host susceptibility plays a role. Understanding of the variables involved in the loss of immune tolerance and development of autoimmunity continues to evolve; however, an environmental trigger is a common characteristic of autoimmune disorders. (Ex. 21, pp. 12-13.) It is believed that these infections trigger an autoimmune response that is cross-reactive against the peripheral nerves. In particular, studies have confirmed that *C. jejuni* results in molecular mimicry against gangliosides leading to the axonal variant of GBS. (*Id*. at 10-11 (citing K.A. Sheikh et al., *Molecular Mimicry in Guillain-Barré Syndrome*, 845 ANNALS N.Y. ACAD. SCI. 307 (1998) (Ex. 25); Hugh J. Willison, *The Immunobiology of Guillain-Barré Syndromes*, 10 J. PERIPHERAL NERVOUS SYS. 94 (2005) (Ex. 26); C. Wim Ang et al., *The Guillain-Barré Syndrome: A True Case of Molecular Mimicry*, 25 TRENDS IMMUNOLOGY 61 (2004) (Ex. 27)).) Although this does suggest that molecular mimicry is operative in the pathogenesis of GBS, the specific antigenic determinants of immune attack by T and/or B cell remains undetermined for most cases of GBS, especially acute inflammatory demyelinating polyneuropathy ("AIDP"). (*Id*. at 11.)

Importantly, the pandemic influenza vaccine used during the 1976-77 swine flu outbreak confirms that vaccinations can act as a trigger for GBS. (Ex. 21, pp. 13-14

[4] Dr. Sheik received his medical degree from King Edward Medical College in Lahore, Pakistan, in 1987. (Ex. 22, p. 1.) From there, he completed an internship and residency at Mayo Hospital in Lahore; an internship at Nassau County Medical Center in East Meadow, New York; a residency in neurology at the Neurological Institute at Columbia University in New York, New York; and a postdoctoral fellowship in peripheral nerve at Johns Hopkins University School of Medicine in Baltimore, Maryland. (*Id.*) Dr. Sheik is a board-certified psychiatrist and neurologist with special qualification in muscle pathology and a subspecialty certification in clinical neuromuscular pathology, and he maintains an active medical license in Texas. (*Id.* at 2.) He currently works in Houston, Texas, as a professor of neurology at the University of Texas Health Sciences, and as an attending neurologist at Memorial Hermann Hospital and Lyndon B. Johnson Hospital. (*Id.*) Dr. Sheikh is a clinician-scientist with special training in neurology and peripheral nerve and a longstanding interest in immune neuropathies, including the pathogenesis of GBS, in particular. (Ex. 21, p. 1.) Since 2001, Dr. Sheikh has been continuously funded by the National Institutes of Health ("NIH") to study the pathogenesis of immune neuropathies. (*Id.*) He also has authored or co-authored more than 200 publications related to inflammatory neuropathies. (*Id.*; *see also* Ex. 22, pp. 14-37.)

(citing INST. OF MED., IMMUNIZATION SAFETY REVIEW: INFLUENZA VACCINES AND NEUROLOGICAL COMPLICATIONS (Kathleen Stratton et al. eds., 2004) (Ex. 38)).) Moreover, this experience underscores that these events may be rare enough that they are only detected when a large population receives the vaccine in a short period of time. (*Id.*) There is no data available for the hepatitis A vaccine similar to what is available from the swine flu pandemic vaccine. Dr. Sheikh notes that case reports and case series are available, which he asserts are valuable "building blocks" of clinical and research science, as well as post-marketing experience from the Havrix package insert. (*Id.* at 14, 17-18 (citing Danith Blumenthal et al., *Possible Association of Guillain-Barré Syndrome and Hepatitis A Vaccination*, 23 PEDIATRIC INFECTIOUS DISEASE J. 586 (2004) (Ex. 49); X. Roux et al., *Syndrome de Guillain-Barré et Vaccination Contre L'hépatite A*, 40 MÉDECINE ET MALADIES INFECTIEUSES 490 (2010) (Ex. 50); J. Pritchard et al., *Risk of Relapse of Guillain-Barré Syndrome or Chronic Inflammatory Demyelinating Polyradiculopathy Following Immunisation*, 73 J. NEUROLOGY NEUROSURGERY PSYCHIATRY 343 (2002) (Ex. 51); Havrix (Hepatitis A Vaccine) Injectable Suspension, for Intramuscular Use: Highlight of Prescribing Information [hereinafter Package Insert] (Ex. 52)).) However, Dr. Sheikh also stresses several publications, mostly case reports but also one case controlled study, for the proposition that the wild-type hepatitis A infection is associated with GBS. (*Id*. at 14-18 (citing C.L.W. Johnston et al., *Acute Inflammatory Polyradiculoneuropathy Following Type A Viral Hepatitis*, 57 POSTGRADUATE MED. J. 647 (1981) (Ex. 40); Vivian V. Bosch et al., *Hepatitis A Virus Immunoglobulin M Antibody in Acute Neurological Disease*, 14 ANNALS NEUROLOGY 685 (1983) (Ex. 41); R. Marés-Segura et al., *Guillain-Barré Syndrome Associated with Hepatitis A*, 19 ANNALS NEUROLOGY 100 (1986) (Ex. 42); J. Azuri et al., *Guillain-Barre Syndrome Following Serological Evidence of Hepatitis A in a Child*, 158 EUR. J. PEDIATRICS 341 (1999) (Ex. 43); Gabriel S. Breuer et al., *A Pregnant Woman with Hepatitis A and Guillain-Barré*, 32 J. CLINICAL GASTROENTEROLOGY 179 (2001) (Ex. 44); Shobha D. Chitambar et al., *Case Report: Hepatitis A Preceding Guillain-Barré Syndrome*, 78 J. MED. VIROLOGY 1011 (2006) (Ex. 45); Yanlei Hao et al., *Antecedent Infections in Guillain-Barré Syndrome: A Single-Center, Prospective Study*, 6 ANNALS CLINICAL & TRANSLATIONAL NEUROLOGY 2510 (2019) (Ex. 46)).)

Dr. Sheikh suggests there are "multiple nonexclusive shared mechanisms" by which infection or vaccination can lead to autoimmunity. (Ex. 21, p. 19.) Specifically:

> (A) The infectious agent or vaccine (attenuated infectious agent or its component) may carry elements that are similar enough in amino acid or glycan sequence or structure to self-antigens that the pathogen or vaccine acts as a self-'mimic'. Termed '*molecular mimicry*', T or B cells that are activated in response to the infectious agent/vaccine are also cross-reactive to self and lead to direct damage and further activation of other arms of the immune system. The concept of molecular mimicry has evolved over time and is quite complex and eloquently discussed in recent reviews. (B) The infectious agent/vaccine may also lead to disease via epitope spreading. In this model, the immune response to an infectious agent/vaccine, or direct lysis by the infectious agent/vaccine, causes damage to self-tissue.

> Antigens released from damaged tissue (usually muscle containing nerve fibers in case of vaccinations) are taken up by antigen presenting cells, and this initiates a self-specific immune response. (C) '*Bystander activation*' describes an indirect or non-specific activation of autoimmune cells caused by the inflammatory environment present during infection or vaccination. A domino effect can occur, where the non-specific activation of one arm of the immune system leads to the activation of other arms. (D) An infectious agent/vaccine may lead to autoimmunity through the processing and presentation of '*cryptic antigens*'. In contrast to dominant antigenic determinants, cryptic antigens are normally invisible to the immune system. The inflammatory milieu that arises after infection/vaccination can induce increased production of different enzymes and differential processing of released self-epitopes by antigen presenting cells (which are recruited to the site of infection or vaccine injection).

(*Id.*)

Thus, Dr. Sheikh opines:

> Molecular mimicry has been reported for GBS in the setting of influenza vaccination and could similarly explain the triggering of GBS in the petitioner (especially in the setting of vaccination with the aluminum adjuvanted hepatitis A vaccine, Havrix). While the exact identity of the antigenic epitope(s) in Havrix that is generating molecular mimicry leading to GBS is still under investigation (and may or may not be similar to that found in influenza vaccines), this does not preclude the importance or relevance of this mechanism. Molecular mimicry theory is supported by clinical observations that both hepatitis A infections and hepatitis A vaccines have triggered GBS in susceptible subjects (vide supra). Notably, the Havrix vaccine is derived from the wild-type hepatitis A virus and the development of GBS with infection and vaccination provides strong evidence for the role of commonly shared hepatitis A antigens involved in molecular mimicry.

(Ex. 21, p. 20 (internal citations omitted).)

He also suggests that other elements of the immune response to vaccination can enhance autoimmune responsiveness. (Ex. 21, p. 20.) Moreover, alum adjuvant assists in allowing a local inflammatory reaction to generate systemic protective immunity by inducing a strong immune response including antibody production. (*Id*. at 20-21.) In particular, alum activates inflammasome, which stimulates cytokines IL-1 and IL-18. (*Id.* (citing Stephanie C. Eisenbarth et al., *Crucial Role for the Nalp3 Inflammasome in the Immunostimulatory Properties of Aluminum Adjuvants*, 453 NATURE 1122 (2008) (Ex. 58)).) Dr. Sheikh asserts that these cytokines are strongly upregulated in the acute phase of GBS. (*Id.* (citing Sebastian Jander & Guido Stoll, *Interleukin-18 Is Induced in Acute Inflammatory Demyelinating Polyneuropathy*, 114 J. NEUROIMMUNOLOGY 253 (2001) (Ex. 61); Kishan K. Nyati et al., *Correlation of Matrix*

*Metalloproteinases-2 and -9 with Proinflammatory Cytokines in Guillain-Barré Syndrome*, 88 J. NEUROSCI. RSCH. 3540 (2010) (Ex. 62)).)

Although petitioner's initial presentation was initially addressed as a cerebrovascular event, Dr. Sheikh opines that petitioner was ultimately correctly diagnosed as having suffered GBS. (Ex. 21, pp. 22-23.) Thus, given his theory of causation, and given that he considers alternative causes of GBS, such as upper respiratory or gastrointestinal infections, to have been ruled out, and further given the timing of onset (about 33 days post-vaccination), Dr. Sheikh opines that the hepatitis A vaccine was the cause of petitioner's GBS. (*Id*.)

Respondent's experts raised a prior diarrheal illness as a possible cause of petitioner's GBS; however, Dr. Sheikh does not agree. (Ex. 65.) Only a single history reported prior episodes of bloody diarrhea, while the review of systems at petitioner's initial admission was not positive for diarrhea. (*Id.* at 1-2 (citing Ex. 2, pp. 79, 164-65).) Moreover, no sick contacts were noted in connection with the reported diarrhea and no medical attention was sought for this complaint. (*Id*. at 2.) Diarrhea is nonspecific and does not necessarily point to an infection. (*Id*. at 3.) Petitioner had other risk factors for bloody diarrhea, including hepatic steatosis, which can lead to portal hypertension and bloody diarrhea, as well as sickle cell trait. And, in fact, petitioner did have prior episodes of gastrointestinal bleeding, which would cast doubt on the idea that the reported episode was truly diarrhea as opposed to bloody stools consistent with prior episodes. (*Id.* (citing Ex. 3, pp. 64-66, 84; Ex. 2, p. 78).) But in any event, petitioner was tested for *C. jejuni* and the test was equivocal. (*Id*. at 3-4 (citing Ex. 2, p. 477).) No further work up was performed and the treating physicians never attributed petitioner's condition to a *C. jejuni* infection. (*Id*.) And, finally, petitioner's anti-glycolipid testing was negative, whereas GBS related to *C. jejuni* is associated with anti-ganglioside antibodies. (*Id*. at 4.)

Dr. Sheikh also notes that:

> While I strongly believe that Mr. Lee did not suffer a gastrointestinal illness, if we assume that he did suffer a gastrointestinal illness, this is not dispositive. Rather, the hepatitis A vaccine and the intercurrent infection could have worked in concert to overcome immune tolerance, with the vaccine priming the immune system and initiating neurologic injury.

(Ex. 65, p. 4.)

**b. Respondent's Neurologist Brian Callaghan, M.D.**[5]

Dr. Callaghan agrees with the GBS diagnosis, but does not agree that the hepatitis A vaccine was a cause. Dr. Callaghan does not agree that Dr. Sheikh established the relevance of data pertaining to post-flu vaccine GBS to the hepatitis A vaccine. Moreover, he stresses that there is no reliable evidence supporting a likely association between the hepatitis A vaccine and GBS. (Ex. A, p. 6.) In fact, Dr. Callaghan cites other literature for the proposition that no association between hepatitis A vaccine and GBS has been detected. (*Id.* at 7 (citing Yong Chen et al., *Vaccines and the Risk of Guillain-Barré Syndrome*, 35 EUR. J. EPIDEMIOLOGY 363 (2020) (Ex. A, Tab 4); Joerg-Patrick Stübgen, *Neuromuscular Complications of Hepatitis A Virus Infection and Vaccines*, 300 J. NEUROLOGICAL SCIS. 2 (2011) (Ex. A, Tab 5)).) Moreover, two of the available case reports involved significant confounding factors, given that one subject had additionally received a typhoid vaccine and another had a *C. jejuni* infection. (*Id.* (citing B. Uriondo San Juan et al., *Síndrome de Guillain-Barré Postinmunization con Vacunas Antihepatitis A y Antifoidea*, 34 ATEN PRIMARIA 379 (2004) (Ex. 47); S. Huber et al., *Combined Acute Disseminated Encephalomyelitis and Acute Motor Axonal Neuropathy After Vaccination for Hepatitis A and Injection with* Campylobacter jejuni, 246 J. NEUROLOGY 1204 (1999) (Ex. 48)).) And, regardless, the best a case report can establish is temporal proximity, which is insufficient to show causation. (*Id*.) Although Dr. Sheikh cited a series of 927 GBS patients, 311 of whom received vaccinations, only three out of 37 hepatitis A vaccine recipients experienced symptoms of relapse. Moreover, there was no control group and recall bias was a likely issue given that the cases were identified by questionnaire. (*Id*. (discussing Pritchard et al., *supra*, at Ex. 51).) Dr. Callaghan stresses that the Institute of Medicine ("IOM")[6] has

---

[5] Dr. Callaghan received his medical degree from the University of Pennsylvania Medical Center in 2004, before going on to complete a preliminary medicine internship in 2005 and a neurology residency in 2008 at the University of Pennsylvania Medical Center in Philadelphia, followed by a neuromuscular fellowship at the University of Michigan Health System in Ann Arbor, Michigan in 2009. (Ex. C, p. 1.) He also earned a master's degree in clinical research design and statistical analysis from the University of Michigan, and he completed a health policy fellowship at the University of Michigan's Center for Healthcare Research and Transformation Policy in 2016. (*Id*.) Since completing his neuromuscular fellowship, Dr. Callaghan has held numerous academic appointments, including professorships in neurology at the University of Michigan Health System, the University of Michigan Medical School, and the VA Ann Arbor Healthcare System. (*Id.* at 1-2.) Currently, Dr. Callaghan serves as a professor of neurology for the University of Michigan and as a staff physician for the VA Ann Arbor Health System's Department of Neurology. (*Id.* at 2.) Additionally, Dr. Callaghan currently holds an administrative appointment as the co-director of the Neuromuscular Division and Associate Program Director for Research at the University of Michigan Health System, as well as the Director of the ALS Clinic at the VA Ann Arbor Health System. (*Id.* at 2.) Dr. Callaghan is board certified in neurology and neuromuscular electrodiagnostic medicine, and he maintains an active medical license in Michigan. (*Id.* at 1.) He has published nearly 150 peer-reviewed articles on various neurological topics, including neuropathy. (*Id.* at 19-28.)

[6] The Institute of Medicine (known as the National Academy of Medicine since 2015) is the medical arm of the National Academy of Sciences. The National Academy of Sciences ("NAS") was created by Congress in 1863 to be an advisor to the federal government on scientific and technical matters (*see* An Act to Incorporate the National Academy of Sciences, ch. 111, 12 Stat. 806 (1863)), and the IOM is an offshoot of the NAS established in 1970 to provide advice concerning medical issues. When Congress

assessed that there is inadequate evidence to establish a causal relationship between the hepatitis A vaccine and GBS. (*Id*. (citing HEPATITIS A VACCINE, *in* INST. OF MED., ADVERSE EFFECTS OF VACCINES: EVIDENCE AND CAUSALITY 421 (Kathleen Stratten et al. eds., 2012) [hereinafter 2012 IOM Report] (Ex. A, Tab 6; *see also* Ex. C, Tab 6)).) Dr. Callaghan does not agree that the treating physicians attributed petitioner's GBS to his vaccination. (*Id.* at 7-8.)

Dr. Callaghan also does not agree that there is an association between hepatitis A infection and GBS. (Ex. A, p. 8.) Again, case reports on that subject are at best suggestive of a temporal relationship. (*Id*.) Moreover, the case-controlled study cited by Dr. Sheikh had significant limitations, given the very small number of patients with hepatitis A (only seven cases versus three controls). (*Id*. (discussing Hao et al., *supra*, at Ex. 46).) By contrast, Dr. Callaghan cites another larger study that examined an outbreak of 292,301 hepatitis A cases and found no increased risk of GBS. (*Id*. (citing Jiangong Xie et al., *Guillain-Barré Syndrome and Hepatitis A: Lack of Association During a Major Epidemic*, 24 ANNALS NEUROLOGY 697 (1988) (Ex. A, Tab 7); *see also* Stübgen, *supra*, at Ex. A, Tab 5).) And, in any event, even if hepatitis A infection was associated with GBS, that would not necessarily imply that the hepatitis A vaccine can also cause GBS. (*Id*.) In particular, Dr. Callaghan cites Stübgen for the proposition that there has been no exploration of whether hepatotropic viruses share any molecular resemblance to components of the peripheral nerves. (*Id.* at 8-9 (citing Stübgen, *supra*, at Ex. A, Tab 5).)

Although Dr. Shiekh cited a number of different mechanisms of autoimmunity, Dr. Callaghan notes that he did not provide any evidence to support the invocation of any of these mechanisms relative to the hepatitis A vaccine and GBS. (Ex. A, p. 9.) Dr. Callaghan does not agree that it is reasonable to extend the causal relationship between *C. jejuni* and the axonal variant of GBS to contend more broadly that molecular mimicry is a cause of GBS in general. (*Id.*) Thus, Dr. Sheikh's discussion of the mechanisms of autoimmunity as linking the hepatitis A vaccine and GBS is "purely hypothetical." (*Id*.) Moreover, without knowing petitioner's own susceptibilities, Dr. Sheikh's discussion of host susceptibility in autoimmune conditions is not informative. (*Id*.)

By contrast, Dr. Callaghan observes that petitioner reported having bloody diarrhea 7-10 days prior to onset of his GBS. (Ex. A, p. 9.) Moreover, antibodies to *C. jejuni* were indeterminate, meaning *C. jejuni* infection may have (though not definitively) caused the diarrhea. (*Id.*) Dr. Callaghan cites three studies as establishing that gastrointestinal infections, regardless of the pathogen, are associated with GBS. (*Id*. at 9-10 (citing Clémence Grave et al., *Seasonal Influenza Vaccine and Guillain-Barré Syndrome: A Self-Controlled Case Series Study*, 94 NEUROLOGY e2168 (2020) (Ex. A, Tab 3); Francesca Galeotti et al., *Risk of Guillain-Barré Syndrome After 2010-2011 Influenza Vaccination*, 28 EUR. J. EPIDEMIOLOGY 433 (2013) (Ex. A, Tab 8); Sharon K. Greene et al., *Guillain-Barré Syndrome, Influenza Vaccination, and Antecedent*

---

enacted the Vaccine Act in 1986, it directed that the IOM conduct studies concerning potential causal relationships between vaccines and illnesses. *See* § 300aa-1 note.

*Respiratory and Gastrointestinal Infections: A Case-Centered Analysis in the Vaccine Safety Datalink, 2009-2011*, 8 PLoS ONE e67185 (2013) (Ex. A, Tab 9)).) Thus, Dr. Callaghan opines that a gastrointestinal infection would be a more likely cause of petitioner's GBS. (*Id.* at 10.)

Although Dr. Sheikh observed that the initial review of systems did not indicate an ongoing diarrheal illness, Dr. Callaghan does not find it surprising that the illness would have cleared prior to that point and suggests that this does not detract from the report of the prior diarrhea, stressing that the report was elicited in the context of diagnosing GBS. (Ex. E, p. 1.) Dr. Callaghan suggests there is no reason to doubt the specific documentation of prior diarrhea and finds Dr. Sheikh's discussion of prior risk factors for bloody stool to be speculative. (*Id.* at 1-2.) He also does not agree the prior encounters with bloody stool are comparable. (*Id*. at 2.) Dr. Callaghan acknowledges that there is no definitive evidence favoring a *C. jejuni* infection, but stresses that gastrointestinal infections more broadly are a cause of GBS. (*Id*.)

**c. Respondent's Immunologist You-Wen He, M.D., Ph.D.[7]**

Although Dr. He agrees that GBS is post-infectious in about two-thirds of case and that certain types of infection are associated with GBS, he also notes that, in about half of GBS cases, the specific pathogen remains unknown. (Ex. C, p. 4 (citing Bianca van der Berg et al., *Guillain-Barré Syndrome: Pathogenesis, Diagnosis, Treatment and Prognosis*, 10 NATURE REVS. 469 (2014) (Ex. C, Tab 1); Peter D. Donofrio, *Guillain-Barré Syndrome*, 23 CONTINUUM 1295 (2017) (Ex. C, Tab 3); Van-Mai Cao-Lormeau, *Gullain-Barré Syndrome Outbreak Associated with Zika Virus Infection in French Polynesia: A Case-Control Study*, 387 LANCET 1531 (2016) (Ex. C, Tab 4); Badrul Islam et al., *Guillain-Barré Syndrome Following Varicella-Zoster Virus Infection*, 37 EUR. J. CLINICAL MICROBIOLOGY & INFECTIOUS DISEASES 511 (2018) (Ex. C, Tab 5)).) And, like Dr. Callaghan, he notes that apart from the specific relationship between *C. jejuni* and AMAN, the pathological mechanisms of GBS are not firmly established. (*Id*.) Dr. He cites several studies for the proposition that a causal link between Havrix vaccine and GBS has not been identified. (*Id.* at 4-5 (citing 2012 IOM Report, *supra*, at Ex. C, Tab 6; Matthew Z. Dudley et al., *The State of Vaccine Safety Science: Systematic Reviews of the Evidence*, 20 LANCET INFECTIOUS DISEASES e80 (2020) (Ex. C, Tab 7); COURTNEY GIDENGIL ET AL., AGENCY FOR HEALTHCARE RSCH. & QUALITY, 21-EHC024, SAFETY OF

[7] Dr. He received his medical degree from The Fourth Military Medical University in Xian, China, in 1986, as well as a Ph.D. in immunology from the University of Miami School of Medicine in 1996. (Ex. D, p. 1.) After completing his Ph.D., Dr. He served as a senior fellow in the immunology department at the University of Washington Howard Hughes Medical Institute. (*Id.*) Since completing his post-doctoral training, Dr. He has held various academic appointments at Duke University Medical Center's Department of Immunology. (*Id.*) Currently, he serves as a tenured professor of immunology and as the director for an advanced immunology course at Duke University Medical Center. (*Id.*; Ex. C, p. 1.) Dr. He has been conducting research in immunology since 1986 with a focus on innate and adaptive immunity against viral and bacterial infections, as well as cancer immunotherapy. (Ex. C, p. 1.) Dr. He has published nearly 140 peer-reviewed articles on immunology and has also held editorial positions for several major biomedical journals. (Ex. D, pp. 7-18.)

VACCINES USED FOR ROUTINE IMMUNIZATION IN THE UNITED STATES: AN UPDATE (2021) (Ex. C, Tab 8)).)

Dr. He discusses several reasons for doubting molecular mimicry as an explanation for autoimmune disease, noting that it "has been strongly challenged" by more recent research. (Ex. C, pp. 6-7.) He stresses that "[b]oth naturally occurring and postinfectious cross-reactive antibodies and T cells are relatively common and most frequently not pathogenic. Cross-reacting antibodies can also be secondary to nonspecific tissue injury rather than primary to tissue injury itself." (*Id.* at 7, 12.) Thus, Dr. He stresses that the finding of tissue-specific antibody response following an antigen exposure is not by itself proof of a pathologic mechanism of disease. (*Id.* at 7, 12.) Instead, Dr. He opines that the critical determinant of autoimmune disease is the strength and extent of immune activation. (*Id.* at 8.) Dr. He contends that this is why infections are associated with GBS. (*Id.*) Dr. He acknowledges that the 1976-77 swine flu pandemic vaccine demonstrated an increased risk of GBS; however, he stresses that subsequent flu vaccines have not been so associated. (*Id.* (citing Nobuhiro Yuki & Hans-Peter Hartung, *Guillain-Barré Syndrome*, 366 NEJM 2294 (2012) (Ex. C, Tab 17); Julia Stowe et al., *Investigation of the Temporal Association of Guillain-Barré Syndrome with Influenza Vaccine and Influenzalike Illness Using the United Kingdom General Practice Research Database*, 169 AM. J. EPIDEMIOLOGY 382 (2009) (Ex. C, Tab 18)).) Moreover, "there is no evidence to support that Havrix vaccination can cause strong immune activation to break immune tolerance." (*Id.*)

Dr. He notes that Dr. Sheikh cites only case reports to suggest a potential causal relationship between hepatitis A infection and GBS, but even assuming such a connection, the vaccination is fundamentally different from the infection. (Ex. C, p. 8.) Dr. He explains that the host immune system uses pattern recognition receptors ("PRRs") to detect pathogens via pathogen-associated molecular patterns ("PAMPS"). (*Id*.) It is the engagement of PRRs by the PAMPs that activates the production of cytokines and the recruitment of other immune cells. (*Id*. at 9.) Specific PRRs activate different cytokines via different signaling pathways. Accordingly, "the more PRRs are engaged by PAMPS, the stronger the immune activation becomes due to the expression of many more inflammatory cytokines." (*Id*.) A wildtype bacterium or virus will generally have more PAMPS that can stimulate more PRRs to activate immune cells than a vaccine will have, meaning the immune response to vaccine will be much weaker. (*Id*.) In the case of Havrix, it uses an inactivated and attenuated virus in order to eliminate viral replication so as not to cause liver damage. (*Id*. (citing Package Insert, *supra*, at Ex. 52; L.N. Binn et al., *Preparation of a Prototype Inactivated Hepatitis A Virus Vaccine from Infected Cell Cultures*, 153 J. INFECTIOUS DISEASE 749 (1986) (Ex. C, Tab 23)).) Moreover, while a wildtype virus or bacteria results in an uncontrolled infection via routes such as the lungs, bloodstream, or cerebrospinal fluid, a vaccine is a controlled process administered intramuscularly and processed at the regional lymph nodes. (*Id*. at 10.)

Nor does Dr. He agree that the inclusion of alum in the vaccine make any difference. He indicates:

> Alum has been used as an immune adjuvant in vaccines for a long time. Its role is to activate host innate immunity, which consists of activation of inflammasome and production of various inflammatory cytokines including IL-1 and IL-18. GBS is an autoimmune disease involving the host innate and adaptive immune systems. Thus, it is expected that the activation of innate immune system is observed in both vaccination and GBS disease. Importantly, the possibility to cause autoimmune disease by the adjuvant aluminum has been definitively refuted in a large pharmaco-epidemiological study. Patients undergoing allergen-specific immunotherapy received 100 to 500 times more injected aluminum over 3 to 5 years, compared with hepatitis B and human papillomavirus vaccine recipients, and have a lower incidence of autoimmune disease, in contrast to reported case series of autoimmune/autoinflammatory syndrome induced by adjuvants. Thus, aluminum is safe and does not increase the risk of autoimmune diseases in human.

(Ex. C, pp. 13-14 (internal citations omitted) (citing Bali Pulendran & Rafi Ahmed, *Immunological Mechanisms of Vaccination*, 12 NATURE IMMUNOLOGY 509 (2011) (Ex. C, Tab 28); Minghang Wang & Zongdi Feng, *Mechanisms of Hepatocellular Injury in Hepatitis A*, 13 VIRUSES 861 (2021) (Ex. C, Tab 29); Bhargavi Sundaresan et al., *The Role of Viral Infections in the Onset of Autoimmune Diseases*, 15 VIRUSES 782 (2023) (Ex. C, Tab 30); Felix Horns et al., *Memory B Cell Activation, Broad Anti-Influenza Antibodies, and Bystander Activation Revealed by Single-Cell Transciptomics*, 30 CELL REPS. 905 (2020) (Ex. C, Tab 31); Rohan Ameratunga et al., *Evidence Refuting the Existence of Autoimmune/Autoinflammatory Syndrome Induced by Adjuvants (ASIA)*, 5 J. ALLERGY & CLINICAL IMMUNOLOGY PRAC. 1551 (2017) (Ex. C, Tab 32)).)

Although Dr. Sheikh also discussed several other autoimmune mechanisms beyond molecular mimicry, Dr. He observes that he provided no specific evidence to support that the Havrix vaccine might cause GBS via any of those mechanisms. (Ex. C, pp. 12-13.)

Dr. He's second report was dedicated to seeking to rebut Dr. Sheikh's opinion that petitioner's hepatitis vaccine and any gastrointestinal illness could have operated in conjunction to break immune tolerance. (Ex. F.) For the same reasons as discussed in his first report, Dr. He maintains that Havrix would not produce a strong enough immune response to break self-tolerance. (*Id.* at 1-3.) Moreover, vaccine-activated T and B cell lymphocytes would be antigen specific and so would not work together with a gastrointestinal illness to break the many layers of immune tolerance. (*Id.* at 4.) Further still, there is no evidence to support such a hypothesis despite both hepatitis A vaccination and gastrointestinal and upper respiratory infections being common. (*Id.*)

## V. Analysis

### a. *Althen* prong one

Under *Althen* prong one, petitioner must provide a "reputable medical theory," showing that the subject vaccine can cause the type of injury alleged. *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006)). Such a theory need only be "legally probable, not medically or scientifically certain." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)). However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory. While it does not require medical or scientific certainty, it must still be 'sound and reliable.'" *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49). That is, although petitioners are not required to prove their theories in any one way, they must in all events support their proffered theory with sound and reliable scientific explanation, *Boatmon*, 941 F.3d at 1359, and provide evidence that establishes on balance that the vaccine at issue can more likely than not cause the injury at issue, *Cerrone v. Sec'y of Health & Human Servs.*, 146 F.4th 1113, 1120-23 (Fed. Cir. 2025).

Petitioner argues that it is well established that GBS can follow either infection or vaccination. (ECF No. 89, p. 22 (citing Ex. 21, pp. 9, 13).) Moreover, petitioner cites a number of publications for the proposition that a natural hepatitis A viral infection is an accepted cause of GBS, which he argues should be accepted as evidence bearing on the causal relationship he asserts relative to the hepatitis A vaccine. (*Id*. at 22-24.) Further to that, there are case reports of individuals suffering GBS following administration of the hepatitis A vaccine and the package insert for Havrix, the specific hepatitis A vaccine at issue in this case, identified GBS as an adverse event in post-marketing experience. (*Id.* at 24-25.) Petitioner notes that his expert cited multiple different mechanisms that can lead to autoimmunity, including molecular mimicry, epitope spreading, bystander activation, and cryptic antigens; however, his argument places particular emphasis on molecular mimicry. (*Id*. at 25-28.) In particular, petitioner notes Dr. Sheikh's explanation that GBS is generally understood to be an autoimmune disorder in which gangliosides are a primary target and ganglioside-specific antibody reactivity is considered an important cause of damage to the nerves. (*Id.* at 26-27 (citing Ex. 21, p. 20).) When juxtaposing the observed relationship between GBS and the flu vaccine with the evidence that hepatitis A infection causes GBS and the fact that the Havrix vaccine is derived from wild-type hepatitis A virus, there is "strong evidence for the role of commonly shared hepatitis A antigens involved in molecular mimicry."

(*Id*. at 27 (quoting Ex. 21, p. 20).) Finally, petitioner also notes that a prior petitioner was compensated for GBS following receipt of a hepatitis A vaccine. (*Id.* at 27-28 (citing *J.G. v. Sec'y of Health & Human Servs.*, No. 20-664V, 2023 WL 2752634 (Fed. Cl. Spec. Mstr. Feb. 13, 2023)).)

In response, respondent stresses that most of the evidence petitioner has presented regarding a causal relationship between hepatitis A infection and GBS is limited to case reports. (ECF No. 91, p. 12.) Petitioner has presented only one case-controlled study that found an association between hepatitis A infection and GBS. (*Id*. at n. 3 (citing Hao et al., *supra*, at Ex. 46).) However, respondent is critical of that study because prior infection was detected only by IgM, which is inadequate to determine when the preceding infection occurred.[8] (*Id.*) By contrast, respondent cites a larger study that found no increase in GBS following hepatitis A infection. (*Id.* (citing Xie et al., *supra*, at Ex. A, Tab 7).) But in any event, respondent urges that petitioner has not established that infection and vaccination can be equated. (*Id.* at 12.) Petitioner has presented only four case reports that would implicate the hepatitis A vaccine as a cause of GBS and respondent's experts contend three of these case reports present confounding factors. (*Id.* at 12-13.) In fact, respondent points out that the IOM evaluated the same four case reports and concluded that they did not provide evidence beyond temporality, with some having too short of an onset based on the mechanism proposed. (*Id.* at 13. (citing Ex. C, p. 11 (quoting 2012 IOM Report, *supra*, at Ex. C, Tab 6, p. 35).) Moreover, although Dr. Sheikh cited an additional paper observing 927 GBS patients, it had no control group, was based on self-reporting, and sought to assess relapses, rather than de novo GBS. (*Id.* at n. 4 (discussing Pritchard et al., *supra*, at Ex. 51).) Thus, respondent contends that petitioner's showing is essentially limited to a single case report, which is only weak evidence. (*Id.* at 13.) By contrast, there is epidemiologic data available that undermines the proposed causal relationship. (*Id.* at 14-15 (citing 2012 IOM Report, *supra*, at Ex. C, Tab 6, p. 35; Stübgen, *supra*, at Ex. A, Tab 5, pp. 4-5; Chen et al., *supra*, at Ex. A, Tab 4; Dudley et al., *supra*, at Ex. C, Tab 7; GIDENGIL ET AL., *supra*, at Ex. C, Tab 8; Evidence-Based Practice Center Systematic Review Protocol: Project Title: Safety of Vaccines Used for Routine Immunization in the United States (Ex. C, Tab 9).) Otherwise, petitioner's resort to multiple different immune mechanisms amounts to a disfavored "kitchen sink" approach and, furthermore, petitioner has not put forward any evidence to support the invocation of molecular mimicry. (*Id*. at 16-17 & n. 10.) And, because molecular mimicry is antigen specific, respondent disagrees that petitioner can reasonably cite evidence pertaining to the flu vaccine to buttress his case. (*Id*. at 17-18.) Even accepting that an association between a natural hepatitis A infection and GBS could support the existence of a homology, that would only be the first step. Homology alone does not establish pathogenesis, and infection and vaccination are fundamentally different. (*Id*. at 19-20.) In particular, Havrix uses a killed and split hepatitis A virus that is incapable of sufficiently activating the immune system without an adjuvant. (*Id*. at 21.)

[8] Although respondent is correct that IgM does not definitively indicate that the infection was recent, IgM is generally viewed as indicative of a recent infection. Moreover, the authors note that data was collected on subjects that had either an upper respiratory or gastrointestinal infection within the four weeks preceding the onset of their neurologic symptoms. (Hao et al., *supra*, at Ex. 46, p. 2.)

Although only the flu vaccine is presumed to be a cause of GBS in this Program (42 C.F.R. § 100.3(a)), petitioners have been found entitled to compensation in at least isolated instances for GBS caused by many other vaccines. *See, e.g.*, *Salmins v. Sec'y of Health & Human Servs.*, No. 11-140V, 2014 WL 1569478, at *14 (Fed. Cl. Spec. Mstr. Mar. 31, 2014) (finding that HPV vaccine "can cause" GBS); *Peugh v. Sec'y of Health & Human Servs.*, No. 99-638V, 2007 WL 1531666, at *17 (Fed. Cl. Spec. Mstr. May 8, 2007) (finding as part of an omnibus proceeding that hepatitis B vaccine can GBS); *Whitener v. Sec'y of Health & Human Servs.*, No. 06-0477V, 2009 WL 3007380, at *20 (Fed. Cl. Spec. Mstr. Sep. 2, 2009) (finding that meningococcal vaccine can cause GBS); *Koller v. Sec'y of Health & Human Servs.*, No. 16-439V, 2021 WL 5027947, at *20 (Fed. Cl. Spec. Mstr. Oct. 8, 2021) (finding that pneumococcal conjugate vaccine, Prevnar 13, can cause GBS); *Mohamad v. Sec'y of Health & Human Servs.*, No. 16-1075V, 2022 WL 711604, at *18 (Fed. Cl. Spec. Mstr. Jan. 27, 2022) (finding that Tdap vaccine can cause GBS), *mot. for rev. denied*, No. 16-1075, 2024 WL 4943421 (Fed. Cl. Nov. 12, 2024), *appeal dismissed*, No. 2025-1370, 2025 WL 1341189 (Fed. Cir. May 8, 2025); *J.G.*, 2023 WL 2752634, at *29-32 (finding that hepatitis A vaccine can cause GBS). In some prior cases, background information regarding the pathogenesis of GBS and the implication of certain flu vaccines as a cause of the condition has partly informed the special masters' analysis of a petitioner's theory of causation with respect to GBS. *See, e.g.*, *J.G.*, 2023 WL 2752634, at *30 (observing that "[t]he experts do not dispute the theory of molecular mimicry, or that it is a sound and reliable theory generally as it relates to GBS" and that "[m]olecular mimicry has been accepted as a sound and reliable theory in many Vaccine Program cases dealing with demyelinating conditions, including GBS"); *Harris v. Sec'y of Health & Human Servs.*, No. 18-944V, 2023 WL 2583393, at *22 (Fed. Cl. Spec. Mstr. Feb. 21, 2023) (finding that "the fact that GBS is well accepted as an autoimmune condition with a wide variety of suspected antigenic triggers, inclusive of antigens from both infection and vaccination, provides meaningful evidence supporting petitioner's burden of proof with respect to *Althen* prong one"). In fact, given the nature of the condition, molecular mimicry has been accepted as a theory of causation for GBS even in the absence of *any* demonstration of homology and cross-reaction. *Salmins*, 2014 WL 1569478, at *14. Thus, I am not persuaded by respondent's argument that seems to suggest that the general pathophysiology of GBS and the association between the swine flu vaccine and GBS is wholly irrelevant.

Nonetheless, the potential association between hepatitis A infection and GBS remains a critical linchpin in petitioner's theory based on Dr. Sheikh's reasoning in this case. Petitioner is correct that the effects of the natural infection are *some* evidence of the corresponding vaccine's injury causing capacity. *E.g.*, *Alvarado v. Sec'y of Health & Human Servs.*, No. 20-327V, 2026 WL 1229942, at *13 (Fed. Cl. Spec. Mstr. Apr. 9, 2026) (accepting that IOM's conclusion that naturel infection is one type, "albeit minor," of evidence supportive of a mechanism of vaccine causation). However, I am not ultimately persuaded by petitioner's attempt to show both that the hepatitis A infection is a cause of GBS and that such a causal relationship would be informative of vaccine causation. There are two primary reasons for this. First, although there is *some*

evidence associating hepatitis A infection with GBS, petitioner has not presented preponderant evidence of such a causal connection. Second, even if the hepatitis A infection can cause GBS, it does not *automatically* follow that the vaccine can do the same. Here, Dr. He has provided an extensive discussion explaining why the hepatitis A vaccine, in particular, is not likely to be capable of producing the same harms as a natural infection. Petitioner has not grappled with his reasoning.

Molecular mimicry "is a generally accepted scientific principle, [but] mere invocation of the scientific term does not carry a petitioner's burden in a Program case." *Deshler v. Sec'y of Health & Human Servs*., No. 16-1070V, 2020 WL 4593162, at *20 (Fed. Cl. Spec. Mstr. July 1, 2020) (citing *Forrest v. Sec'y of Health & Human Servs.*, No. 14-1046V, 2019 WL 925495, at *3 (Fed. Cl. Spec. Mstr. Jan. 28, 2019)). Petitioners in this Program are not required to establish scientific certainty. *See, e.g.*, *Gross v. Sec'y of Health & Human Servs.*, No. 17-1075V, 2022 WL 9669651, at *36 (Fed. Cl. Spec. Mstr. Sep. 22, 2022) (finding that criteria, including supportive epidemiology, identification of antibodies directed against human antigens, identification of the mimics of the target antigen, and reproduction in an animal model, is tantamount to "require[ing] scientific certainty, which is a bar too high"). However, with regard to the application of molecular mimicry, prior cases have stressed that "[t]he line must be drawn somewhere between speculation and certainty." *Brayboy v. Sec'y of Health & Human Servs.*, No. 15-183V, 2021 WL 4453146, at *19 (Fed. Cl. Spec. Mstr. Aug. 30, 2021). Thus, for example, in *Brayboy*, an omnibus proceeding addressing autoimmune premature ovarian insufficiency, the special master found it sufficient that the petitioners "identified cross-reaction between components of the vaccine and proteins in the body that are directly responsible for the health and productivity of the organ at issue" and further expressed that requiring additional steps, or insisting on direct, testable evidence would impermissibly heighten petitioner's burden of proof. *Id.* Here, even accepting the applicability of molecular mimicry to GBS broadly, absent an association between hepatitis A infection and GBS, petitioner has offered very little that would otherwise suggest that the hepatitis A vaccine would be among the potential triggers of molecular mimicry leading to GBS.

Although Dr. Shiekh cited quite a few publications purporting to show hepatitis A infection as a cause of GBS, these are largely case reports or case series. (Ex. 21, pp. 14-16 (discussing Johnston et al., *supra*, at Ex. 40; Bosch et al., *supra*, at Ex. 41; Marés-Segura et al., *supra*, at Ex. 42; Azuri et al., *supra*, at Ex. 43; Breuer et al., *supra*, at Ex. 44; Chitambar et al., *supra*, at Ex. 45).) Petitioners in this Program often highlight the usefulness of case reports in cases of rare diseases or unusual occurrences. *E.g.*, *Patton v. Sec'y of Health & Human Servs.*, 157 Fed. Cl. 159, 166-68 (2021). However, case reports "do not purport to establish causation definitively, and this deficiency does indeed reduce their evidentiary value," even though they are not entirely devoid of evidentiary value. *Paluck ex rel. Paluck v. Sec'y of Health & Human Servs.*, 104 Fed. Cl. 457, 475 (2012) (quoting *Campbell v. Sec'y of Health & Human Servs.*, 97 Fed. Cl. 650, 668 (2011)). Based on my review of the case reports provided in this case, none of the publications provide data beyond a purported temporal association. However, "single case reports of Disease X occurring after Factor Y . . . do not offer strong

evidence that the *temporal* relationship is a *causal* one—the temporal relationship could be pure random chance." *Crutchfield v. Sec'y of Health & Human Servs.*, No. 09-0039V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), *aff'd*, 125 Fed. Cl. 251 (2014). Dr. Sheikh acknowledges that the cited case reports included a "spectrum of clinical findings" and inconsistently detected anti-hepatitis A antibodies in cerebral spinal fluid. (Ex. 21, p. 16.)

Petitioner also filed a single case-controlled study (Hao et al., *supra*, at Ex. 46); however, its findings relative to the hepatitis A virus were not robust. As Dr. Callaghan observed, only seven patients had IgM for the hepatitis A virus versus three among the control group. (Ex. A, p. 8; Hao et al., *supra*, at Ex. 46, p. 5.) Moreover, a significant confounding factor existed in that three of the hepatitis A patients also tested positive for other infections, including one case of concurrent C. jejuni infection, as well as one case of concurrent infection with both C. jejuni and influenza B, both of which were much more strongly associated with GBS. (*Compare* Hao et al., *supra*, at Ex. 46, fig. 1, *with id.* at tbl. 2.) Accordingly, hepatitis A virus was only isolated in four GBS patients, while it was also detected in three controls. By contrast, Dr. Callaghan cited a much larger study of hepatitis A infection patients that found no increased risk of GBS. (Ex. A, p. 8; Xie et al., *supra*, at Ex. A, Tab 7; *see also* Stübgen, *supra*, at Ex. A, Tab 5 (literature review suggesting that epidemiology on balance does not support hepatitis A virus as an important trigger for GBS).)[9] While petitioner need not present epidemiology to meet his burden of proof, *Capizzano*, 440 F.3d at 1325, "[n]othing in *Althen* or *Capizzano* requires the Special Master to ignore probative epidemiological evidence that undermines petitioner's theory," *D'Tiole v. Sec'y of Health & Human Servs.*, 726 F. App'x 809, 811 (Fed. Cir. 2018). Thus, "where such evidence is submitted, the Special Master can consider it in reaching an informed judgment as to whether a particular vaccination likely caused a particular injury." *Andreu*, 569 F.3d at 1379.

Additionally, even if one were to accept that hepatitis infection can cause GBS, Dr. He explained why this cannot be extrapolated to the hepatitis A vaccine without more. In general, vaccines are less potent than infections because they have limited pathogen-associated molecular patterns ("PAMPS") to interact with the pattern recognition receptors ("PRRs") that act as signals for the immune response. (Ex. C, pp. 8-9.) "[T]he more PRRS are engaged by PAMPS, the stronger the immune activation becomes due to the expression of many more inflammatory cytokines." (*Id*. at 9.) Furthermore, although the example of the swine flu vaccine shows that some vaccines can nonetheless result in GBS, Dr. He explained that the Havrix vaccine, in particular, is specifically formulated to eliminate replication. (*Id*. (citing Package Insert, *supra*, at Ex. 52).) Thus, for example, studies have confirmed that the vaccine does not cause liver damage while wild-type hepatis infection does. (*Id*. (citing Chitambar et al., *supra*, at

---

[9] Notably, Dr. Callaghan also filed a report by the IOM regarding adverse effects of the hepatitis A vaccine which, though it did find evidence of vaccine-related GBS to be lacking, noted that the hepatitis A infection has rarely been associated with GBS. (2012 IOM Report, *supra*, at Ex. A, Tab 6, p. 6.) However, the publication cited by the IOM for this proposition has not been filed and the other evidence of record suggests that the available epidemiology overall does not establish any clear causal relationship. (*E.g*., Stübgen, *supra*, at Ex. A, Tab 5, pp. 2-3.)

Ex. 45).) Therefore, Dr. He opines that the hepatitis A vaccine is unlikely to result in as strong of an immune response as the wild infection, leaving its ability to comparably cause autoimmune disease much less likely. (*Id*. at 9-10.) Although Dr. Sheikh did subsequently file a supplemental report, he did not address this discussion at all, leaving Dr. He's opinion entirely unrebutted. (Ex. 65.) Accordingly, I accept Dr. He's opinion as casting additional significant doubt on petitioner's reliance on the effects of natural infection to evidence the capacity of the hepatitis A vaccine to cause GBS. *E.g.*, *Gaskin v. Sec'y of Health & Human Servs*., No. 21-835V, 2025 WL 786306, at *12 (Fed. Cl. Spec. Mstr. Feb. 11, 2025) (accepting respondent's expert's opinion that live attenuated vaccines replicate less effectively than infection and have reduced pathogenicity, meaning the effects of a virulent infection are not indicative of the effects of vaccination). Dr. Sheikh's initial discussion of the role of alum adjuvant (Ex. 21, p. 21-22) does not effectively counter this point and, in any event, I do not find it persuasive. The fact that the hepatitis A vaccine produces cytokines, which are also present in GBS, as part of its intended immune response does not demonstrate that the vaccine contributes to the pathology of GBS. As another special master has repeatedly noted, petitioners often seek unpersuasively "to convert the intended effect of vaccination, and/or a vaccine's understood capacity to provoke some immune response, into something pathogenic, but without sufficient probative evidence to connect all the dots." *Eberline v. Sec'y of Health & Human Servs*., No. 23-655V, 2025 WL 3852456, at *17 (Fed. Cl. Spec. Mstr. Dec. 1, 2025) (citing *Palattao v. Sec'y of Health & Human Servs.*, No. 13-591V, 2019 WL 989380, at *36 (Fed. Cl. Spec. Mstr. Feb. 4, 2019)).

Petitioner notes that GBS was documented in the post-marketing experience within the package insert for Havrix vaccine. (*See* Package Insert, *supra*, at Ex. 52, pp. 7-8.) Significantly, however, there is no indication that GBS was observed in the clinical trials. (*Id*. at 5-7.) By contrast, the post-marketing experience includes a disclaimer that "[b]ecause these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to the vaccine." (*Id.* at 7-8.) Indeed, the package insert does not even disclose how many reports of GBS occurred. (*Id*. at 8.) By contrast, GBS is not discussed with respect to contraindications, warnings and precautions, or adverse reactions. (*Id*. at 2.) Generally, postmarketing experience is not viewed as good evidence of causation. *H.L. ex rel. A.I. v. Sec'y of Health & Human Servs*., No. 10-0197V, 2016 WL 3751848, at *13 (Fed. Cl. Spec. Mstr. Mar. 17, 2016) (accepting respondent's expert's opinion that "postmarketing experience is distinct, and of lesser significance than, either contraindications or warnings"), *mot. for rev. denied*, 129 Fed. Cl. 165 (2016), *aff'd*, 715 F. App'x 990 (Fed. Cir. 2017); *see also Werderitsh v. Sec'y of Health & Human Servs*., No. 99-319V, 2005 WL 3320041, at *8 (Fed. Cl. Spec. Mstr. Nov. 10, 2005).

Without an established link between hepatitis A infection and GBS as a basis for supposing that hepatitis A antigen can provoke a relevant molecular mimic, petitioner has offered no other basis upon which to assume the hepatitis A vaccine would cause GBS. Petitioner filed four case reports of post-vaccination GBS; however, I agree with

respondent's experts' criticisms of these specific case reports. Moreover, as explained above, case reports are a weak form of evidence. Petitioner also filed a publication by Pritchard et al., which reviewed questionnaires from established GBS patients. (Pritchard et al., *supra*, at Ex. 51.) Out of 311 GBS patients who reported receiving immunizations subsequent to developing GBS, 11 reported mild increases in fatigue, weakness, paresthesia, and numbness after vaccination. (*Id*. at 1.) Of those, three received a hepatitis A vaccine, though a total of 37 respondents reported receiving hepatitis A vaccines. (*Id.* tbl. 1.) Moreover, the authors note that most of the less frequently administered vaccines were given at the same time as other vaccinations. (*Id*.) Thus, this paper does not credibly suggest a causal relationship between hepatitis A vaccine and worsening of GBS.

Petitioner also notes that Dr. Sheikh cited other mechanisms, such as bystander activation, epitope spreading, and cryptic antigens. However, he was also very clear in noting that he felt molecular mimicry was the "most likely" explanation for petitioner's GBS. (Ex. 21, p. 19.) Based on my review of Dr. Sheikh's reports and the complete record, I do not agree that any of these other concepts are sufficiently developed to stand on their own as a distinct theory following my determination that molecular mimicry is not preponderantly supported. I have also considered petitioner's citation to *J.G.*, in which the petitioner was found entitled to compensation for GBS caused-in-fact by the hepatitis A vaccine. *J.G.*, 2023 WL 2752634. However, I do not agree with the reasoning in that decision with respect to *Althen* prong one. *Id.* at *31-32. In particular, I find the available case reports regarding GBS following both hepatitis A infection and hepatitis A vaccination are due much less weight than they were given in *J.G*.

Accordingly for all these reasons and based on the record as a whole, I conclude that petitioner has not met his burden of proof under *Althen* prong one.

**b. *Althen* prong two**

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326-27; *Grant*, 956 F.2d at 1147-48. Medical records are generally viewed as particularly trustworthy evidence. *Cucuras*, 993 F.2d at 1528. However, medical records and/or statements of a treating physician's views do not *per se* bind the special master. *See* § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder*, 88 Fed. Cl. at 745 n.67 ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."). A petitioner may support a cause-in-fact claim through either medical records or expert medical opinion. § 300aa-13(a). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines*, 940 F.2d at 1528).

Petitioner cites four different notations from petitioner's treating physicians that he argues attribute his GBS to the preceding hepatitis A vaccination. (ECF No. 89, pp. 29-30 (citing Ex. 3, pp. 150, 374, 383, 386).) He also notes that the treating physicians listed hepatitis vaccination as an allergy. (*Id.* at 29 (citing Ex. 3, p. 136).) Moreover, he stresses that he did not suffer GBS prior to vaccination and experienced onset of his condition about 33 days post-vaccination, timing that he argues supports a causal inference. (*Id.* at 30.) Although respondent's experts cite a preceding diarrheal illness as a more likely cause, petitioner stresses that the report of prior bloody diarrhea was by history only and was not the subject of any medical attention despite other unrelated medical encounters. (*Id.* at 31.) Diarrhea is nonspecific, petitioner noted no sick contacts, and petitioner had other risk factors for bloody stool or diarrhea. (*Id.* at 31-32.) In fact, petitioner had other prior episodes of GI bleeding for which he sought treatment with no evidence of any cold or flu-like symptoms. He argues that these prior encounters demonstrate that petitioner's treatment for rectal bleeding was focused on hypertension, rather than gastrointestinal infection. (*Id.* at 32-33 (citing Ex. 3, pp. 64-67; Ex. 65, p. 3; Ex. 10, pp. 391-93).) Apart from the diarrhea itself, there are no other signs of infection. (*Id.* at 32.) Given these considerations and his demonstration as to *Althen* prong one, petitioner asserts that a logical sequence of cause and effect favors his hepatitis A vaccine as the cause of his condition. (*Id.* at 33-34.)

In response, respondent stresses that treating physician opinions are not binding, but also disagrees that the cited notations actually implicate petitioner's vaccine as a cause of his condition. (ECF No. 91, pp. 27-28.) Respondent argues that each of the cited notations is merely petitioner's own subjective report included within the history of present illness. (*Id*. at 28-29.) Moreover, respondent suggests the allergy to vaccination was likewise based on petitioner's subjective report, noting a separate notation that indicates that "'[p]er report,' petitioner had GBS 'after hepatitis vaccination in July 2017' and 'refused all vaccinations [secondary] to [history of] GBS due to HBV' [sic]." (*Id.* (alterations in original) (quoting Ex. 3, pp. 1020, 1024).) Therefore, none of the cited opinions reflect any treating physician opinion. (*Id*. at 29.) Respondent also argues that petitioner's report of bloody diarrhea 7-10 days prior to onset of his GBS, coupled with his equivocal test for *C. jejuni*, support a gastrointestinal infection as an alternative cause of petitioner's condition. (*Id*. at 31.) Although petitioner had other explanations for the blood in petitioner's stool, respondent argues they are not persuasive and, moreover, do not explain the diarrhea. (*Id*. at 32-33.) Respondent suggests that sick contacts are less significant in the context of gastrointestinal infections. (*Id*. at n. 19.)

A treating physician's mere reference to a temporal relationship between vaccination and symptoms is not equivalent to drawing a causal connection. *Moberly*, 592 F.3d at 1323-24; *Isaac v. Sec'y of Health and Human Servs*., No. 08-601V, 2012 WL 3609993, at *26 (Fed. Cl. Spec. Mstr. July 30, 2012) (explaining that "[a] treating physician's recognition of a temporal relationship does not advance the analysis of causation"), *mot. for rev. denied*, 108 Fed. Cl. 743 (2013), *aff'd per curiam*, 540 F. App'x 999 (Fed. Cir. 2013). For example, a special master has previously explained that medical records may include notations where a physician "may well be indicating a

*question* in the physician's mind whether there is a causal relationship, or a *suspicion* that there might be a causal relationship. However, that is quite different from an indication that such physician has reached a *conclusion* concerning a causal relationship . . . ." *Stapleford v. Sec'y of Health and Human Servs.*, No. 03-234V, 2009 WL 1456441, at *17 n.24 (Fed. Cl. Spec. Mstr. May 1, 2009) (emphasis in original), *aff'd*, 89 Fed. Cl. 456 (Fed. Cl. 2009). Based on my own review of the medical records, I do not see any instance in the medical records where any treating physician drew what could be considered a clear causal opinion regarding petitioner's GBS. I agree with respondent that the specific notations cited by petitioner, including the fact of his listed allergy to the hepatitis vaccine, most likely represent documentation of petitioner's own subjective attribution of his GBS to his vaccine. (Ex. 3, pp. 136, 150, 374, 383, 386; *see also id.* at 1020, 1024 (documenting petitioner's refusal of hepatitis vaccines based on his history of GBS).) Conversely, however, despite eliciting a history of recent prior episodes of diarrhea, none of the treating physicians actually took the further step of attributing petitioner's condition to a gastrointestinal illness. Accordingly, the medical records are best interpreted as silent with respect to the cause of petitioner's GBS, a point which disfavors petitioner given his *prima facie* burden of proof.

Turning to the expert opinions, I am persuaded that petitioner's prior episodes of bloody stools suggest that the fact that his diarrhea was noted to have been bloody is not likely significant. Indeed, respondent's experts did not seek to rely on the fact that the blood in petitioner's stool was informative of whether he had a gastrointestinal illness. However, I am not persuaded that Dr. Sheikh's specific explanations for petitioner's bloody stools would account for diarrhea. Accordingly, the report of prior diarrhea, which it must be stressed was elicited in evaluation of whether petitioner was suffering GBS (Ex. 2, pp. 164-65), is some evidence suggestive of a gastrointestinal infection, though Dr. Sheikh does reasonably note that diarrhea in itself is nonspecific. Although petitioner stresses the lack of reported sick contacts, this is not a reason to doubt a gastrointestinal illness. Dr. Sheikh further stresses that petitioner did not clearly test positive for *C. jejuni* and, moreover, did not test positive for the antibodies associated with *C. jejuni*-related GBS. (Ex. 65, pp. 3-4.) However, Dr. Callaghan explained that gastrointestinal illness is an accepted cause of GBS without respect to a specific pathogen. (Ex. E, p. 1 (citing Grave et al., *supra*, at Ex. A, Tab 3; Galeotti et al., *supra*, at Ex. A, Tab 8; Greene et al., *supra*, at Ex. A, Tab 9).)

Of course, petitioner is not obligated to demonstrate that the vaccine was the sole cause of his condition. *Shyface*, 165 F.3d at 1352-53. In that regard, Dr. Sheikh did put forward the notion that the combined effect of an infection and vaccination could have broken immune tolerance to cause GBS. (Ex. 65, p. 4.) However, Dr. Sheikh's opinion was limited to merely a single sentence that merely asserted that this is possible. (*Id.*) Dr. He, by contrast, offered an extensive rebuttal of this point in his second report. (Ex. F.) On this record, I do not find the idea of any synergism between infection and vaccination to be preponderantly supported, given Dr. Sheikh's lack of explanation of the proposed sequence of cause and effect and Dr. He's more extensive rebuttal.

Had petitioner prevailed under *Althen* prong one and/or provided a more robust affirmative showing under *Althen* prong two, the available evidence of a potential preceding gastrointestinal illness would not have been strong enough to confound his *prima facie* case on this record. And, to be clear, I am not requiring petitioner to eliminate a gastrointestinal illness as a potential cause of his condition. *Walther v. Sec'y of Health & Human Servs*., 485 F.3d 1146, 1149-52 (Fed. Cir. 2007). However, on this overall record, even the limited evidence suggestive of a gastrointestinal illness appears to stand as the best available explanation for petitioner's condition absent other meaningful evidence. *Accord Winkler*, 88 F.4th at 963 (holding that a special master may consider the possibility of a gastrointestinal illness as a potential source of injury without a specific finding of a *C. jejuni* infection). Petitioner's diarrheal episodes were closer in time to the onset of his GBS (7-10 days prior versus 33 days prior) and are suggestive (though not definitive) of a gastrointestinal illness. Dr. Callaghan has substantiated that gastrointestinal illness broadly is accepted as a cause of GBS, while petitioner has not demonstrated the hepatitis A vaccine to be a likely cause of GBS.

But in any event, even if no other potential cause of petitioner's GBS was in evidence, that would not be a reason to implicate petitioner's vaccination without more. For example, even the above-discussed study by Hao et al., which screened GBS patients for fourteen pathogens, still found that 70 out of 150 subjects had no identifiable infection, while also noting that other studies have suggested that about one-third of GBS patients do not report any antecedent infection. (Hao et al., *supra*, at Ex. 46, pp. 1, 4.) Apart from temporality, petitioner has not presented evidence that supports a logical sequence of cause and effect. "Although probative, neither a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation." *Althen*, 418 F.3d at 1278 (citing *Grant*, 956 F.2d at 1149).

Ultimately, petitioner bears the preponderant burden of proof under *Althen* prong two. Given his failure to demonstrate the injury causing capacity of the vaccine at issue under *Althen* prong one coupled with the lack of any meaningful treating physician support for his assertion that the hepatitis A vaccine was the cause of his own GBS, petitioner has not met that preponderant burden of proof.

**c. *Althen* prong three**

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1278. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* at 1281. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.*; *Shapiro v. Sec'y of*

*Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *mot. for recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd per curiam*, 503 F. App'x 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. denied sub nom.*, *C.K. v. Sec'y of Health & Human Servs.*, 113 Fed. Cl. 757 (2013), *aff'd sub nom.*, *Koehn v. Sec'y of Health & Human Servs.*, 773 F.3d 1239 (Fed. Cir. 2014).

Petitioner notes that his GBS arose 33 days post-vaccination, which he further notes is consistent with the 3-42 day Table window for post-flu vaccine GBS. (ECF No. 89, p. 35.) Thus, he argues that Dr. Sheikh reasonably opined that the timing of onset supports a causal inference. (*Id.*) Moreover, he observes that the onset in the prior compensated hepatitis A/GBS case, *J.G. v. Secretary of Health & Human Services*, was a similar 36 days post-vaccination. (*Id.* (citing *J.G.*, 2023 WL 2752634, at *35).) Therefore, he contends the timing of onset was not reasonably disputed by respondent's experts. (*Id.* (citing Ex. C, p. 16 (Dr. He stating that "[t]he time between Mr. Lee's Havrix vaccination and his GBS onset indeed has a temporal relation").) Respondent, however, stresses that he does not agree that petitioner met his burden of proof under *Althen* prong one, which means he also cannot meet his burden of proof under *Althen* prong three. (ECF No. 91, pp. 36.) Regardless, it is petitioner's burden to establish a medically acceptable timeframe and petitioner has not done so. Petitioner cannot simply "piggy back" on the Vaccine Injury Table, given that the hepatitis vaccine is not the flu vaccine, and prior cases are not binding and are distinguishable. (*Id.* at 36-37.)

In light of the analyses under *Althen* prongs one and two, it is not necessary to resolve the parties' difference under *Althen* prong three. Assuming *arguendo* that petitioner met his burden under *Althen* prong three, satisfaction of *Althen* prong three standing alone would not satisfy petitioner's overall burden of proof. *Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom.*, *Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *Hibbard v. Sec'y of Health & Human Servs.*, 698 F.3d 1355, 1364-65 (Fed. Cir. 2012) (holding that the special master did not err in resolving the case pursuant to *Althen* prong two when respondent conceded that petitioner met *Althen* prong three). Moreover, even if further assuming petitioner had also met his burden under *Althen* prong one, the Federal Circuit has explicitly endorsed that, even where a petitioner has met *Althen* prongs one and three, it may still be appropriate in some circumstances to conclude under *Althen* prong two that the probability of coincidence or another cause prevents the conclusion that the vaccine caused the injury. *Capizzano*, 440 F.3d at 1327. In this case, *Althen* prong two would still remain dispositive for the reasons discussed above.

## VI. Conclusion

There is no question that petitioner has suffered and that the events discussed throughout this decision profoundly affected his life. He has my sympathy, and I do not question his sincerity in bringing this claim. However, for all the reasons discussed

above, I find that petitioner has not met his burden of proof in this case. Therefore, pursuant to § 300aa-12(d)(3)(A) and Vaccine Rule 10, this decision concludes that petitioner is not entitled to an award of compensation. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a).

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master